**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **FRANCISCO J. GONZALEZ, AND ALL OTHERS SIMILARLY SITUATED,** | § § § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION** |
| | § | **FILE NO.  4:07-CV-02941** |
| **v.** | § | |
| | § | |
| | § | |
| **ADVANCE AMERICA, CASH ADVANCE CENTERS OF TEXAS, INC., ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., KEN E. COMPTON, AND ROBERT SHAW,** | § § § § § | **JURY DEMANDED** |
| **Defendants.** | § § | |

_____

**PLAINTIFF FRANCISCO GONZALEZ' RESPONSE AND OPPOSITION TO
DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION**
_____

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................. 1

II.  STATEMENT OF THE CASE .................................... 3

III. STATEMENT OF THE ISSUES .............................. 3

IV.  SUMMARY OF THE ARGUMENT ......................... 4

V.   STATEMENT OF FACTS ....................................... 6

    A.   Defendants' stores in the Houston Metropolitan Area
        are organized identically .................................. 6

    B.   Defendant Advance America's written policy on off-the-clock
        work versus its unwritten policy on off-the-clock work .......... 6

    C.   Advance America's method of maintaining employee time
        records conflicted with its unwritten policy ............. 10

VI.  THE LAW REGARDING COLLECTIVE ACTIONS ............. 11

    A.   Collective actions under the FLSA .................... 11

    B.   Factors considered at the decertification stage .......... 11

    C.   The "Similarly Situated" requirement ................ 12

VII. PLAINTIFFS ARE SIMILARLY SITUATED ................ 14

    A.   Plaintiffs' employment setting demonstrates that they are
        similarly situated ................................... 14

        1.   CMs, AMs and CSRs have the same job duties in the
            Houston Metropolitan Area .......................... 15

        2.   CMs, AMs and CSRs worked off-the-clock ........... 15

        3.   CMs, AMs and CSRs were subject to the same supervision .... 16

        4.   CMs, AMs and CSRs were subject to the same
            pay provisions .................................... 16

B.    The defenses alleged by Defendants are not individualized and are without merit ................................................................. 17

1.   Defendants have alleged no individualized defenses against Plaintiffs ...................................................... 17

    a.  Management knowledge ................................................ 17

    b.  *De Minimis* ................................................................. 20

    c.  Statute of limitations ................................................... 21

    d.  Mr. Greg Zachary was not always a salaried employee ....... 22

C.    Fairness and procedural considerations support moving forward with the collective action .......................................... 22

1.   Considerations of fairness support maintaining this collective action ...................................................................... 22

2.   The Court has the necessary means to ensure a manageable trial ........................................................................ 23

3.   Bifurcation ...................................................................... 24

4.   Subclasses ...................................................................... 24

VIII.   CONCLUSION ................................................................................ 24

## TABLE OF EXHIBITS

Exhibit A - Deposition Excerpts of Dennis Fisher; Jerry Stuckey; Francisco Gonzalez; Daniel Amezaga; Greg Zachery; Chloe Meeks; Crystal Coco; Marivel Hernandez; Ridgeno Lousteau; Sabrina Herrara; Denise Bean; Janet Nelson; Roderick Jackson; Terry Jackson; Willette D. Curtis; Cheritha C. Robinson; Edward Patterson; and Lakeitha V. Robert

Exhibit B - Center Manager – Advance America Position Description

Exhibit C - Assistant Center Manager – Advance America Position Description

Exhibit D - Customer Service Representative – Advance America Position Description

# TABLE OF AUTHORITIES

Page(s)

A. Cases*

*Aguirre v. SBC Communications, Inc.*
No. Civ.A. H-05-3198, 2006 WL 964554 ........................................................ 13

*Anderson v. Cagle's Inc.*
488 F.3d 945, 953 (11th Cir. 2007) ........................................................ 11, 12

*Anderson v. Mt. Clemens Pottery Co.*
328 U.S. 680 (1946) ........................................................ 24

*Ayers v. SGS Control Servs.*
2007 WL 646326, at *18 (D.N.Y. Feb. 27, 2007) ........................................................ 13

*Brennan v. General Motors Acceptance Corp.*
482 F.2d 825 (5th Cir. 1973) ........................................................ 17,18,19

*Burry v. National Trailer Convoy, Inc.*
338 F.2d 422, 426 (6th Cir. 1964) ........................................................ 20

*Clark v. Dollar Gen. Corp.*
2001 WL 878887 (M.D. Tenn. May 23, 2001) ........................................................ 19

*Cunningham v. Gibson Elec. Co., Inc.*
43 F.Supp.2d 965 (N.D. Ill. 1999) ........................................................ 19

*Donovan v. Bel-Loc Diner, Inc.*
780 F.2d 1113 (4th Cir. 1985) ........................................................ 23

*Donavan v. Brandel*
736 F.2d 1114 (6th Cir. 1984) ........................................................ 22

*Falcon v. Starbucks Corporation*
Civil Action No. H-05-0792 (S.D. Tex. January 15, 2008) ........................................................ 13,14,16

*Gulf King Shrimp Co. v. Wirtz*
407 F.2d 508 (5th Cir. 1969) ........................................................ 20

*Hayes v Laroy Thomas, Inc.*
No. 5:05-cv-00227 (E.D. Tex. Apr. 3, 2007) ........................................................ 13

*Hayes v Laroy Thomas, Inc.*
2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) ........................................................ 13

*Hill v. Muscogee County Sch. Dist.*
2005 WL 3526669 (M.D. Ga. Dec. 20, 2005) ................................................................ 14,15

*Hipp v. Liberty Nat'l Life Ins. Co.*
252 F.3d 1208 (11th Cir. 2001) .................................................................................... 12

*Hoffman-LaRoche, Inc. v. Sperling*
493 U.S. 165 (1989) ..................................................................................................... 22

*Hyman v. First Union Corp.*
982 F.Supp. 1 (D.D.C. 1997) ....................................................................................... 17

*Lusardi v. Xerox Corp.*
118 F.R.D. 351 (D.N.J 1987) ................................................................................... 3,4,11

*Martinez v. Food City, Inc.*
658 F.2d 369 (5th Cir. 1981) ....................................................................................... 17,18

*Mireles v. Frio Foods, Inc.*
899 F.2d 1407 (5th Cir. 1990) ...................................................................................... 21

*Montoya v. Rescue Industries, Inc.*
176 F.3d 489 (10th Cir. 1999) ...................................................................................... 12

*Mooney v. Aramco Servs. Co.*
54 F.3d 1207 (5th Cir. 1995) ................................................................................. 4,11,12,14

*Moss v. Crawford & Co.*
201 F.R.D. 398 (W.D. Pa. 2000) .................................................................................. 14

*National Electro-Coatings, Inc. v. Brock*
1988 U.S. Dist. LEXIS 16937 (N.D. Ohio) ................................................................ 23

*Nerland v. Caribou Coffee Co., Inc.*
No. 05-1847 (D. Minn. Apr. 6, 2007) ......................................................................... 13

*Nerland v. Caribou Coffee Co., Inc.*
No. 05-1847 (D. Minn. May 17, 2007) ....................................................................... 13

*Newton v. City of Henderson*
47 F.3d 746 (5th Cir. 1995) .......................................................................................... 19

*Riojas v. Seal Produce, Inc.*
82 F.R.D. 613 (S.D. Tex. 1979) .................................................................................. 13

*Rodolico v. Unisys Corp.*
199 F.R.D. 468 (E.D.N.Y. 2001) ........................................................   22

*Shaffner v. Cash Register Sales & Serv.*
2006 WL 1007542 (S.D. Tex. April 17, 2006) .................................   3

*Simmons v. T-Mobile*
H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) ..................   13

*Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ...........   11,12,15

*Tucker v. Labor Leasing, Inc.*
872 F.Supp. 941 (M.D. Fla. 1994) ...................................................   13

*Tumminello v. United States*
14 Cl. Ct. 693 (1998) ......................................................................   11

*Vaszlavik v. Storage Tech. Corp.*
175 F.R.D. 672 (D. Colo. 1997) .....................................................   22

*Villatoro v. Kim Son Restaurant, L.P.*
286 F.Supp.2d 807 (S.D. Tex. 2003) ..............................................   11

*Wilks v. Pep Boys*
No. 3:02-0837, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) .............   11

*Wilks v. Pepboys*
2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) ............................   13

B.  Statutes and Regulations

29 U.S.C. § 201 ....................................................................................   3
29 U.S.C. § 216(b) ...............................................................................   11,12,13
29 C.F.R. § 785.13 ...............................................................................   19
29 C.F.R. § 785.47 ...............................................................................   21
Fed. R. Civ. P. 20 .................................................................................   12
Fed. R. Civ. P. 42 .................................................................................   12
Fed. R. Civ. P. 42(b) ............................................................................   24

* Should the Court require, Plaintiff will submit a copy of all authority outside the 5th Circuit.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FRANCISCO J. GONZALEZ, AND ALL OTHERS SIMILARLY SITUATED, §§§ | | |
| **Plaintiff,** | § | |
| | § | CIVIL ACTION |
| | § | FILE NO.  4:07-CV-02941 |
| v. | § | |
| | § | |
| | § | |
| ADVANCE AMERICA, CASH ADVANCE CENTERS OF TEXAS, INC., ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., KEN E. COMPTON, AND ROBERT SHAW, | § | JURY DEMANDED |
| **Defendants.** | § | |

---

### PLAINTIFF FRANCISCO GONZALEZ'S RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION

---

Now comes Plaintiff FRANCISCO GONZALEZ ("Plaintiff") and files this Response and Opposition to Defendants ADVANCE AMERICA, CASH ADVANCE CENTERS OF TEXAS, INC., CASH ADVANCE CENTERS, INC., KEN E. COMPTON, AND ROBERT SHAW (collectively "Advance America" or "Defendants") Motion to Decertify Collective Action, and in support thereof shows the Court as follows:

## I.  __INTRODUCTION__

This case arises out of Advance America's attempt to cut costs and maintain profitability at the expense of its Center Managers, Assistant Center Managers, and Customer Service Representatives.  After extensive discovery, it is now clear that this matter is suitable for Fair Labor Standards Act ("FLSA") collective action treatment through trial.  Plaintiff Francisco Gonzalez, Gonzalez' direct supervisor Daniel Amezaga, Area Manager Greg Zachary, and the opt-in Plaintiffs all consistently tell of the same, and in most cases, identical experience at

Advance America in terms of having tremendous pressure to work overtime hours without getting paid for those hours.  Witness after witness testifies that despite having an elegant policy requiring them to not work 'off-the-clock', Advance America's management pressured them to complete their job duties within forty (40) to forty-two (42) hours a week, a goal that was not realistically achievable. This pressure came via an unwritten rule that anyone who attempted to submit more than forty-two or so hours a week would be fired.

Incidentally, Mr. Gonzalez is not the first employee of Advance America who has come forth for his unpaid off-the-clock wages; that honor belongs to two former employees of Advance America who complained in 2006 to the U.S. Department of Labor ("DOL"), claiming unpaid wages worked off-the-clock, which prompted an investigation by the DOL involving a small number of Advance America store locations, and a desire to expand the investigation company-wide.[1,2]

Sparing no expense, in order to quell the government's investigation, Advance America hired on as a consultant Mr. Jerry Stuckey, a former District Director of the DOL who retired from the DOL after working there for forty-two (42) years.[3]  Coincidentally, Mr. Stuckey was Mr. Scott's (last name unknown) boss for several years at the DOL, the very person who was in charge of the Advance America off-the-clock investigation.[4]  Needless to say, the DOL cleared Advance America shortly after Mr. Stuckey's involvement in the matter, solely on the basis of a "face to face" meeting with Scott, without the need of ever presenting to the DOL a single document or report of any kind.[5]  Regardless, at this stage of the proceedings, Plaintiff acknowledges, and meets, his heightened burden by demonstrating that he and the opt-in

---

[1] Exhibit A – Dennis Fisher dep., p. 6, ll. 14-25; p. 7, ll. 1-9.
[2] Exhibit A – Jerry L. Stuckey dep., p. 27, ll. 3-14.
[3] Exhibit A – Jerry L. Stuckey dep., p. 18, ll. 5-12.
[4] Exhibit A – Jerry L. Stuckey dep., pp. 94-96.
[5] Exhibit A – Jerry L. Stuckey dep., p. 92, ll. 21-25; p. 93, ll.1-21.

Plaintiffs are similarly situated to each other in manners that are legally significant.

## II.  <u>STATEMENT OF THE CASE</u>

Plaintiff Francisco Gonzalez filed this putative collective action on behalf of himself and others similarly situated under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, to recover unpaid overtime wages from Defendants Advance America, Cash Advance Centers of Texas, Inc., Advance America, Cash Advance Centers, Inc., Ken E. Compton, and Robert Shaw. The Court granted Plaintiff's Motion for Conditional Class Certification on October 17, 2008. Subsequently, Plaintiff sent notice to approximately 1,200 putative class members, informing Center Managers ("CM"), Assistant Center Managers ("AM") and Customer Service Representatives ("CSR") who were employed by Advance America from October 17, 2005 to the present who were denied overtime compensation for hours worked in excess of forty (40) in a work week of their right to participate in this lawsuit.  By the end of the notice period, sixty-two (62) individuals from across the Houston Metropolitan Area had joined the collective action, ten of whom were dismissed by court Order for failure to participate in discovery, leaving fifty-two (52) opt-in Plaintiffs.

For the reasons set forth below, Defendant's Motion to Decertify Collective Action should be denied and the case should be allowed to proceed to a trial on the merits as a collective action.

## III.  <u>STATEMENT OF THE ISSUES</u>

The sole issue before the Court is whether the opt-in Plaintiffs are "similarly situated" to Mr. Gonzalez and one another.  This District has previously determined that the proper legal standard in evaluating this inquiry is the two-stage *Lusardi* method.  *Shaffner v. Cash Register Sales & Serv.*, 2006 WL 1007542 (S.D. Tex. April 17, 2006) (applying *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J 1987)).  The first stage is used to determine whether to conditionally

certify the class and allow notice. *Id.* at 754-55.  During the second stage, after sufficient discovery, the Court makes a factual determination as to whether the collective class members are similarly situated to the Plaintiff. *Id.* at 755.  Substantial discovery has occurred in this case, and Plaintiffs now ask the Court to permit this action to proceed to trial as a collective action.

Because the U.S. Court of Appeals for the Fifth Circuit has yet to adopt a specific standard for determining the decertification issue, it uses a two-part standard of review. *Id.* (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1210 (5th Cir. 1995)).  The legal standard applied by the district court is reviewed *de novo. Id.*  The district court's application of that standard is reviewed for abuse of discretion. *Id.*

## IV.  SUMMARY OF THE ARGUMENT

As a part of the discovery process, twenty-two (22) witnesses have been deposed, including Plaintiff Gonzalez, his direct supervisor, Mr. Daniel Amezaga, and a former Houston Area Supervisor, Mr. Greg Zachary.  The parties have conducted discovery touching upon the "similarly situated" analysis, which indicates that while the CM, AM, and CSR positions were under the same pressures to meet their center's budgets, Advance America strongly discouraged overtime and was aware that their employees were working off-the-clock.

Specifically, while Advance America had a policy of discouraging overtime hours and work performed off-the-clock, there was a simultaneous unwritten policy that imposed mandatory operating hours and disciplining employees for failing to perform work outside of those hours. Thus employees were forced to omit actual hours worked, resulting in underpayment of their wages. [6]  Ignoring the practice of their unwritten policy, Defendants now bring this motion to decertify, naively claiming they had no idea that Mr. Gonzalez and others worked off-the-clock to complete their job duties.  Being unable to successfully refute the fact that

---

[6] Exhibit A – Daniel Amezaga dep., p. 34, ll. 19-25; p. 35, ll.1-24.

Mr. Gonzalez and the opt-in plaintiffs are similarly situated in this regard and in regard to their job duties, Advance America erroneously argues its meritless substantive defenses in its motion to decertify collective action.

As the Court will see from the record evidence, the opt-in Plaintiffs are all similarly situated to Mr. Gonzalez and one another.  It is undisputed that all fifty-two opt-in plaintiffs were employed in one or more of the following standardized positions at Defendants' retail stores: Center Manager, Assistant Center Manager, Customer Service Representative. In their respective capacities, they had the same job title,[7] the same job description, *Id.*, the same job duties, *Id.*, and the same job training, *Id.*; they were subjected to identical company policies, *Id.*; they worked under the same pay policies;[8] they worked under the same budget concerns and reported through the same local, district, regional and area hierarchies.[9]   These are facts admitted by the Defendants' current Director of Operations over Texas, Mr. Dennis Fisher.

Discovery has also revealed substantial evidence demonstrating a single, overreaching practice of Defendants to encourage Plaintiffs to work off-the-clock. Plaintiffs were all victims of Defendants' practice that allowed, if not encouraged, this violation.

Defendants assert no individualized defenses that would necessitate decertification of the class.  Instead, Defendants ask the Court to decertify based upon the alleged merits of its 'class-wide' defenses.  Although an examination of the merits is not proper in a motion to decertify – which is solely concerned with whether the collective class is similarly situated – Defendants' asserted defenses are nevertheless wholly without merit.

Finally, considerations of fairness, procedure, and judicial economy mandate that Plaintiffs, who are substantially similar in all ways relevant to Defendants' Motion and this

---

[7] Exhibit A – Dennis Fisher dep., p. 35, ll. 18-25; p. 36, ll.1-8.
[8] Exhibit A – Dennis Fisher dep., p. 29, ll. 2-20.
[9] Exhibit A – Dennis Fisher dep., pp. 27-29.

Response, be allowed to maintain this collective action.  For these reasons, the Court should

deny Defendants' Motion.

## V.  <u>STATEMENT OF FACTS</u>

**A.     Defendants' stores in the Houston Metropolitan Area are organized identically.**

Defendants are engaged in the operation of loan offices and own and operate over 2,800

loan offices throughout the United States.  These loan offices, known by Advance America as

'Centers', are operationally organized in an identical manner in Texas.[10]  That is, every Center in

Texas has a Store Manager, who is supervised by an Area Manager. *Id.*  Each Store Manager

supervises an Assistant Manager, and in addition Customer Service Representatives. *Id.* In their

respective capacities, the CMs, AMs and CSRs have the same job titles,[11] the same job

descriptions, *Id.*, the same job duties, *Id.*, and the same job training, *Id.*; they were subjected to

identical company policies, *Id.*; they worked under the same pay policies;[12] they worked under

the same budget concerns and reported through the same local, district, regional and area

hierarchies.[13]

**B.     Defendant Advance America's written policy on off-the-clock work versus its
        unwritten policy on off-the-clock work.**

Advance America has in effect an official written policy of prohibiting off-the-clock

work.[14]  However, Advance America also had an unwritten policy of encouraging or allowing

Center Managers, Customer Representative Managers, and Assistant Managers to work off-the-

clock in order to complete all of their duties.  (See, e.g., Exhibit A: Roderick Johnson Dep. at 11

(explaining that he was told to perform certain duties off-the-clock such as inputting information

---

[10] Exhibit A – Dennis Fisher dep., pp. 27-29.
[11] Exhibit A – Dennis Fisher dep., p. 35, ll. 18-25; p. 36, ll.1-8.
[12] Exhibit A – Dennis Fisher dep., p. 29, ll. 2-20.
[13] Exhibit A – Dennis Fisher dep., pp. 27-29.
[14] Exhibit A – Dennis Fisher dep., pp. 42-45.

into the computer, updating, calling customers); Nicole Bean Dep. at 15, 23, 24 (stating that Advance America wanted her to do her job, expected her to work off-the-clock, but did not want her to get overtime because they were going through financial issues, so she worked off-the-clock because she wanted to keep her job); Jacqueline Williams Dep. at 11 (describing her supervisor's email to her when she was performing her duties while still clocked in: "Why are you still clocked in?"); Crystal Coco Dep. at 17 (explaining management's rationale behind servicing a client while on lunch: "why would let your [customer] leave the center, it's not our guarantee that they will come back…why chance it?"; Greg Zachary Dep. at 26, 27 (As an Area Manager, Mr. Zachary "looked the other way" when his employees were working off-the-clock); Greg Zachary Dep. at 67, 69, 70 (As an Area Manager, Mr. Zachary was instructed to not incur overtime because that equated to limiting expenses, and counting every penny were definitely part of daily operations at Advance America; he was also instructed to have his managers keep all hourly employees' weekly hours to 40; "Overtime was a curse word"); Daniel Amezaga Dep. at 22 (Lisa Garcia was told that if she worked more than 42 hours a week, she would be fired); Daniel Amezaga Dep. at 36, 37 (In his training as a District Director, Mr. Amezaga was told that 40 hours plus 2 hours of overtime per week for his employees was the maximum allowed)).

The job duties of Advance America's employees were not achievable in 40 to 42 hours per week. (See, e.g., Exhibit A: Greg Zachary Dep. at 73 (CSRs and AMs were expected to do their jobs in 40-hour work-weeks, but that was not always achievable due to the cyclical nature of Advance America's business); Daniel Amezaga Dep. at 68 (Advance America employees pressured to work off-the-clock when they could not complete their job in 40 hours); Daniel Amezaga Dep. at 79-82 (Advance America employees could not be successful in their jobs

within 40-42 hours per week, which was enough time only to achieve their basic duties, and not duties that would allow the store to be successful and grow such as marketing and collections).

Among others, Gonzalez's duties as the Center Manager included: maintaining effective operation and continued growth of the Center under the direction of Daniel Amezaga, the Divisional Director of Operations; Center Management; budget control; employee relations; leadership; training; product knowledge; marketing; collections; customer service; data entry; phone calls; center appearance; and local travel.  See Daniel Amezaga Dep. at 78.

Facing the pressures of completing all of his job duties as a Center Manager, Mr. Gonzalez often worked off-the-clock as he knew that he could not exceed a certain number of hours of overtime. (Gonzalez Dep. at 28).[15]  This was true for other employees as well.  See Exhibit A: Edward Peterson Dep. at 8 (asserting why he did not like working for Advance America: "the hours that we worked…the time allotted to do the tasks that was needed wasn't sufficient; and we had to work a lot more than normal to complete certain tasks"); Crystal Coco Dep. at 20, 22 (explaining that she did field calls as well as bank runs while off-the-clock as excess money in the store was prohibited). At least Mr. Amazega sometimes allowed Mr. Gonzalez two hours of overtime as for some Center Managers, any overtime was strictly forbidden.  See Exhibit A, Marivel Hernandez Dep. at 30 (stating that Advance America said they would not pay for any overtime).  Mr. Amazega, Mr. Gonzalez's direct manager, stated that there were so many things to complete; therefore, he preached to his subordinates to do whatever it takes to get the job done.  Exhibit A: Amezaga Dep. at 29.  Further, Mr. Gonzalez testified that there was a time in which he did not have any help and he only received assistance when he

---

[15]  Defendants purport that Mr. Gonzalez's testimony is precisely the way depicted to the Court.  However, a quick glance of Gonzalez's testimony on page 32 of his deposition does not provide such clean testimony demonstrating that Mr. Gonzalez could avoid excessive overtime hours without having to close his center.  See Defendant's Motion for Summary Judgment at 5.

needed a day off as his supervisor did not want him to reach a certain number of hours in a week (See Exhibit A, Gonzalez Dep. at 32). Nonetheless, Mr. Gonzalez's direct supervisor admits that he was aware that Mr. Gonzalez worked off-the-clock for duties such as going to the bank and going on field visits at the homes of the customers even on his day off. Exhibit A: Amezaga Dep. at 32.

The goal for the Center Managers was to meet their numbers regardless of their duties. See Exhibit A: Amezaga Dep. at 35. Mr. Amezaga testified that he was aware that his employees would "rather just, you know, quietly get the job done rather than, you know, getting fired for under – not performing…so you know, you put the pressure down to your people and just sort of did whatever they had to do to get the job done, so. I mean I wasn't gonna go dig in who was working off-the-clock or not because if, you know – if I knew, then I had to sort of do something about it." See Exhibit A: Amezaga Dep. at 35.

Other Center Managers were threatened with termination for recording overtime hours. See Exhibit A: Marivel Coty Hernandez Dep. at 31-32 (acknowledging that she was threatened with discipline for recording overtime hours and termination for performance); Exhibit A: Lakeitha Robert Dep. at 15, 16 (stating "no one ever told me [to work off-the-clock], "it was more or less implied if—more like, LaKeitha, you need to get these numbers in line, you need to collect, you need to do whatever you need to do to collect….I needed my job"); Exhibit A: Edward Peterson Dep. at 15, 37, 39, 41 (explaining that while overtime was discouraged, working off-the-clock was implied: "If we didn't get a chance to get it done, we would get wrote up…[i]f we couldn't finish, we'd better; if we do anything over that, that's on us"…he told us not to report it, "[h]e left it to us to kind of manage that."

**C.    Advance America's method of maintaining employee time records conflicted with its unwritten policy.**

There is a general consensus among Mr. Gonzalez' immediate supervisor and other Center Managers from other stores: everyone did what they had to do in order to get the job done, regardless of how many hours off-the-clock they had to work, the numbers had to be in line. See Exhibit A: Marivel Coty Hernandez Dep. at 39 (stating that "work had to get done and we were told it needed to get done by any means necessary"); Lakeitha Robert Dep. at 9 (stating "you had to make sure that all your numbers come in line and Advance America has set up what they expect for this particular center…[a]nd you have to make sure that you're—making sure those numbers are in line").

The pressure of completing the duties, without overtime, and within a certain budget seemed unattainable for Center Managers such as Mr. Gonzalez.  Exhibit A: Lakeitha Robert Dep. at 20 (acknowledging that she was told that she was recording too many overtime hours: "okay, why are you getting 40 plus hours for a week, what's going on..[y]ou can't do that…[y]our store's only budgeted this amount"); Terry Jackson Dep. at 9, 13 (indicating that in the middle of break, her supervisors would call her back to work, she was specifically told to work off-the-clock, and the company did not want her to work overtime); Willette Curtis Dep. at 15, 16 (asserting that her supervisor told her that she was not getting any overtime); Edward Peterson Dep. at 73 (recounting when his supervisor McNeil knew he had clocked out, but still required him to work and complete reports: "Well, McNeil, I'd already clocked out...well you know you're supposed to finish those reports before you leave the center…I said, yes sir…well you know you're going to get wrote up for that…yes sir, I know that"); Cheritha Robinson Dep. at 34 (explaining why she worked off-the-clock: "I had to do what I had to do to keep my job…I had no problem doing it if I had enough hours; but if you want me to keep my hours under this

and still do all this, I had no choice.  That's what was told to me and I didn't want to lose my job.  All the time, my job was held over my head all the time.").

## VI.   THE LAW REGARDING COLLECTIVE ACTIONS

### A.   Collective actions under the FLSA.

The FLSA specifically allows plaintiffs to bring actions "for and on behalf of …themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Thus, "[t]he evident purpose of the [FLSA] is to provide one lawsuit in which the claims of different employees, different in amount but *all arising out of the same character of employment,* can be presented and adjudicated, regardless of the fact that they are separate and independent of each other." *Tumminello v. United States*, 14 Cl. Ct. 693, 696 n.4 (1998) (emphasis in original).

Plaintiffs need only show that they are "similarly situated" in order to maintain a collective action.  *See* 29 U.S.C. § 216(b); *see also Tumminello,* 14 Cl. Ct. at 696; *Villatoro v. Kim Son Restaurant, L.P.*, 286 F.Supp.2d 807, 808-09 (S.D. Tex. 2003).

### B.   Factors considered at the decertification stage.

At the decertification stage, courts generally consider the following factors when determining whether a lawsuit should proceed collectively: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See, e.g., Mooney,* 54 F.3d at 1213 n. 7, 1215-16 (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987)); *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *Anderson v. Cagle's Inc.,* 488 F.3d 945, 953 (11th Cir. 2007); *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006).

C.     The "Similarly Situated" requirement.

The Fifth Circuit has not defined 'similarly situated' in the context of an 'off-the-clock'
collective action.  However, in *Mooney v. Aramco Servs. Co.,* the Fifth Circuit considered this
term in an age discrimination collective action case brought under the ADEA, which uses the
same analysis as the FLSA. 54 F.3d. 1207 (5th Cir. 1995).  At the time *Mooney* was decided
(1995), the court found "based on our review of the case law, no representative class has ever
survived the second stage of review." *Id.* at page 1214.  As reflected below, the trend has since
been for courts to routinely deny decertification.

Since *Mooney* was decided in 1995, the Tenth and Eleventh Circuit Courts of Appeal
have dealt squarely with this issue and given us guidance on how to evaluate the 'similarly
situated' requirement. *See, i.e., Montoya v. Rescue Industries, Inc.*, 176 F.3d 489 (10th Cir. 1999)
(reversing lower court's order granting decertification in an FLSA case); and *Thiessen v. General
Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) (citing *Mooney* with approval); *Anderson v.
Cagle's Inc.,* 488 F.3d 945 (11th Cir. 2007) (citing *Mooney* with approval); *Hipp v. Liberty Nat'l
Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001) ("[T]he 'similarly situated' requirement of § 216(b)
is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42
(severance)" …The plaintiffs may meet this burden, which is not heavy, by making substantial
allegations of class-wide discrimination, that is, detailed allegations supported by affidavits
which successfully engage defendants' affidavits to the contrary." (citing *Thiessen,* 267 F.3d at
1097).

Similarly, numerous district courts have considered the decertification issue in the
context of FLSA collective actions and have followed the recent trend of denying decertification

by emphasizing that "similarly situated", as contemplated by § 216(b), does not mean identically situated.[16]

In our District, the Honorable District Judge Keith P. Ellison issued an Opinion and Order on January 15, 2008, in *Falcon v. Starbucks Corporation*, Civil Action No. H-05-0792. The issues in that case were very similar to the case at bar, in that it was an FLSA collective action in which Plaintiff Falcon (a former assistant manager of Starbucks) and others similarly situated to him were routinely required to work off-the-clock and were not paid for those hours. Judge Ellison denied Starbucks' request for decertification, observing that despite Starbucks having in place an official written policy of prohibiting off-the-clock work, it nevertheless enforced an unwritten policy of encouraging or allowing assistant managers to work off-the-clock in order to control overtime costs. On the "similarly situated" issue, Judge Ellison cited in part as follows: "Ultimately, the Court believes that, at a minimum, there must be "meaningful 'identifiable facts or legal nexus [that] bind the claims,'" *Simmons v. T-Mobile*, H-06-1820, 2007 WL 210008, at *8 (S.D. Tex. Jan. 24, 2007) (citing *Aguirre v. SBC Communications, Inc.*, No. Civ.A. H-05-3198, 2006 WL 964554, at *5), so that hearing the cases together furthers the purposes of section 216, is fair to both parties, and does not result in an unmanageable trial. *See*

---

[16] *See, i.e., Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D. Tex. 1979); *see also, Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 947 (M.D. Fla. 1994); *Ayers v. SGS Control Servs.*, 2007 WL 646326, at *18 (D.N.Y. Feb. 27, 2007) (The court denied decertification because "on balance, the difference among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected."); *Hayes v Laroy Thomas, Inc.*, No. 5:05-cv-00227 (E.D. Tex. Apr. 3, 2007), findings and conclusions adopted at *Hayes v Laroy Thomas, Inc.*, 2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) (Plaintiffs' claims are based on a uniform, systematically applied practice that allegedly violates the FLSA and presents common issues of law and fact arising from the same alleged activity); *Wilks v. Pepboys*, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) (decertification denied in off-the-clock case with court noting: "given the plaintiffs' proffer of significant evidence supporting their contention that the defendant, despite its written policies, subjected them to impermissible time-keeping and overtime practices, the court finds that the plaintiffs have demonstrated their subjection to a common, impermissible practice in a manner that suffices to meet their burden at the decertification stage of the proceedings." *Id* at *5); *Nerland v. Caribou Coffee Co., Inc.*, No. 05-1847 (D. Minn. Apr. 6, 2007), findings and conclusions adopted at *Nerland v. Caribou Coffee Co., Inc.*, No. 05-1847 (D. Minn. May 17, 2007) (decertification denied because: 1) there was a uniform written job description applicable to all store managers; 2) the evidence showed most managers worked overtime; and 3) defendant had made the decision to classify managers as exempt as a group, rather than making individual determinations of how each should be classified).

*also Hill v. Muscogee County School Dist.*, 2005 WL 3526669, at *2 (M.D. Ga. 2005) ("At the core of the 'similarly situated' inquiry is the question whether the issues in the case can be adjudicated collectively.")." *Falcon v. Starbucks Corporation*, 4:05-cv-00792 (S.D. Tex, January 15, 2008, Document No. 159, p. 12.).

## VII.   PLAINTIFFS ARE SIMILARLY SITUATED

**A.   Plaintiffs' employment setting demonstrates that they are similarly situated.**

This first consideration in determining whether Plaintiffs are similarly situated is whether the factual and employment settings of the individual Plaintiffs are disparate. *Mooney*, 54 F.3d at 1213 n.7.   Under this factor, courts look at considerations such as job duties, geographical location, supervision, and pay provisions of the Plaintiffs. *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000).

Here, the evidence is overwhelming that Plaintiffs had similar employment settings. Namely, Plaintiffs either are Center Managers, Assistant Center Managers, or Customer Service Representatives. They thus share one of these three titles. Next, Defendants' corporate headquarters in Spartanburg, South Carolina, promulgated only one job description each for CMs, AMs, and CSRs.   Similarly, Defendants trained these classes of employees and measured their performance using a single set of criteria.

According to Mr. Dennis Fisher, the current Director of Operations over all of Advance America's Centers in Texas, in their respective capacities, CMs, AMs and CSRs have the same job title,[17] the same job description, *Id.*, the same job duties, *Id.*, and the same job training, *Id.*; they are accountable under identical company policies, *Id.*; they work under the same pay

---

[17] Exhibit A – Dennis Fisher dep., p. 35, ll. 18-25; p. 36, ll.1-8.

policies;[18] they work under the same budget concerns and report through the same local, district, regional and area hierarchies.[19]

### 1. CMs, AMs and CSRs have the same job duties in the Houston Metropolitan Area.

CMs, AMs and CSRs have uniform job descriptions across all Centers in the Houston Metropolitan Area, which is the geographic area set for the class in this matter.  Attached as **Exhibits B, C, and D**, respectively are Advance America's standard job descriptions for each of these positions.

### 2. CMs, AMs and CSRs worked off-the-clock.

When Plaintiffs did not have enough time to complete the foregoing duties in 40 hours or less, they performed these duties off the clock.[20]

The foregoing off-the-clock duties further illustrate that Plaintiffs are similarly situated. *See Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669 (M.D. Ga. Dec. 20, 2005) (holding that defendant's focus on specific tasks resulting in overtime "too narrow," and that the duties for which plaintiffs were not paid were consistent with plaintiffs' normal job duties, thereby rendering plaintiffs similarly situated), *see also Hill at *3* ("[I]f there is sufficient evidence of an employer's pattern of subjecting employees to the same improper practice, that would be sufficient to warrant a finding of similarly justifying collective adjudication.").

More recently, Judge Ellison in this District held that:

"Defendants [Starbucks] correctly note that it is not unlawful for an employer to have a policy of discouraging overtime.  Where such a policy, however, in combination with other factors, leads to a consistent pattern of FLSA violations, it can support a finding that Plaintiffs are similarly situated for purposes of section 216.

---

[18] Exhibit A – Dennis Fisher dep., p. 29, ll. 2-20.
[19] Exhibit A – Dennis Fisher dep., pp. 27-29.
[20] In order to avoid repetition, Plaintiffs refer the Court to Statement of Facts Sections B (Defendant Advance America's written policy on off-the-clock work versus its unwritten policy on off-the-clock work) and C (Advance America's Method of Maintaining Employee Time Records Conflicted With Its Unwritten Policy) above.

Although the incentives created by Starbucks' conflicting mandates may not have led all managers nationwide to act in lockstep, the deposition testimony supports a finding that the opt-in plaintiffs currently before the Court were, in fact affected similarly. It would certainly not be in the interest of judicial economy to decertify a class of similarly situated plaintiffs simply because, after discovery, it becomes apparent that the alleged policy was not uniform as plaintiffs believed at step one. An employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs before the Court.

That ASMs did not perform exactly the same duties off-the-clock does not undermine the conclusion that the putative class is similarly situated. All of the deposed opt-ins allege that they were not compensated for job duties they performed over 40 hours either because they worked those hours off-the-clock or because managers shaved time off of hours they reported. Nor does the fact that all of the putative class members were paid *some* overtime defeat a finding of similarly situated, given that all of the deposed opt-ins also consistently claim that they were not paid overtime for *all* of the hours they worked. Finally, the fact that Store Managers were allowed to vary from set labor budgets to some degree and may have been allowed more leeway with overtime hours, for example, at certain times of the year does not change the fact that Plaintiffs have presented significant evidence that the environment created by Starbucks' policies appears to have led to a pattern of off-the-clock work and time shaving." [internal citations omitted]

*Falcon v. Starbucks Corporation*, 4:05-cv-00792 (S.D. Tex, January 15, 2008, Document No. 159, p. 13).

### 3. CMs, AMs and CSRs were subject to the same supervision.

As demonstrated above, each store had a similar complement of employees – all of whom were supervised by an Area Manager and a District Director of Operations. Accordingly, their line of reporting and supervision was the same across the Houston Metropolitan Area, the defined geographic region of the class.

### 4. CMs, AMs and CSRs were subject to the same pay provisions.

It is undisputed that with the exception of one CM, Greg Zachary, who was on a salaried basis only after he was promoted to Area Manager, all other opt-in plaintiffs were paid on an

hourly basis (Exhibit A: Greg Zachary Dep. at 22, ll. 3-8).  In fact, Mr. Zachary was also paid on

an hourly basis while he was a CM. *Id.*

**B.     The defenses alleged by Defendants are not individualized and are without merit.**

    **1.  Defendants have alleged no individualized defenses against Plaintiffs.**

In only two (2) pages of briefing, Defendants assert a few defenses to Plaintiffs' claims,

erroneously characterizing them as "individualized", and suggesting they weigh in favor of

decertifying the case.  Specifically, Defendants raise four alleged defenses: 1) lack of employer

knowledge, 2) the doctrine of *de minimis* overtime; 3) statute of limitations applicable to some of

the opt-ins; and 4) one salaried Center Manager who was later promoted to Area Manager.

Defendants' arguments in this regard fail as a matter of law, and Defendants' Motion on this

ground should be denied.

As an initial matter, simply alleging a number of individualized defenses is not enough to

support a decision to decertify. *See Hyman v. First Union Corp.*, 982 F.Supp. 1, 6 (D.D.C. 1997)

("The existence of asserted separate defenses with respect to each Plaintiff does not

automatically eliminate §16(b) joinder; *Thiessen*, 267 F.3d at 1107 (concluding that "the

presence of 'highly individualized' defenses clearly did not, as the district court concluded,

outweigh 'any potential benefits in proceeding as a collective action.'").

    **a.  Management knowledge**

With respect to the alleged lack of management knowledge of overtime worked,

Defendants misstate the law and the evidence.  First, the Fifth Circuit follows the rule that an

employer cannot shield itself from liability under the FLSA by burying its head in the sand and

not attempting through diligence to determine whether its employees are working off the clock.

*See Martinez v. Food City, Inc.*, 658 F.2d 369, 375 (5th Cir. 1981) (citing *Brennan v. General*

*Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973)).   As in this case, the employers in *Martinez* and *Brennan* argued that they had limited or no knowledge of unreported overtime, relied on employees to report their hours fully, and promulgated memoranda to encourage full reporting.  *Id.*   Observing that the immediate supervisors may have had actual knowledge of uncompensated overtime, and that a reasonably diligent employer could have acquired knowledge of the violations of FLSA, the *Martinez* and *Brennan* courts held the employers had, at a minimum, constructive knowledge of the violations.   Based upon the evidence presented below, the same application should be found here.

Indeed, at the case at bar, and contrary to the misstatements made by Defendants, Advance America had actual knowledge of the overtime worked by Plaintiffs (*See, e.g.*, Exhibit A: Roderick Johnson Dep. at 11 (explaining that he was told to perform certain duties off-the-clock such as inputting information into the computer, updating, calling customers); Nicole Bean Dep. at 15, 23, 24 (stating that Advance America wanted her to do her job, expected her to work off-the-clock, but did not want her to get overtime because they were going through financial issues, so she worked off-the-clock because she wanted to keep her job); Jacqueline Williams Dep. at 11 (describing her supervisor's email to her when she was performing her duties while still clocked in: "Why are you still clocked in?"); Crystal Coco Dep. at 17 (explaining management's rationale behind servicing a client while on lunch: "why would let your [customer] leave the center, it's not our guarantee that they will come back…why chance it?").

A number of Plaintiffs' managers also knew that employees were working off the clock (*See, e.g.*, Exhibit A: Greg Zachary Dep. at 26, 27 (As an Area Manager, Mr. Zachary "looked the other way" when his employees were working off-the-clock); Greg Zachary Dep. at 27, 28, 29 (Area Manager, Mr. Zachary, and his supervisor (District Director of Operations Gary

Grzehowiak) were aware of employees working off-the-clock, but no disciplining took place; company policies regarding off-the-clock work were largely ignored); Amezaga Dep. at 21, 22 (Amezaga aware that the following individuals that reported to him were working off-the-clock: Francisco Gonzalez, Lisa Garcia, Eric, Nicki, Crystal, Guermo Camino, Denise, Amber, Rhonda). Simply put, Defendants' argument that there may have been a varying degree of knowledge, or no knowledge, is immaterial under this "knew or should have known" analysis.

Defendants also argue that they are shielded from liability because they had a policy of paying all overtime hours worked, and an additional policy that required employees to report all hours worked. This is simply not a valid defense. "The mere promulgation of a rule against [working "off the clock"] … is not enough." *Clark v. Dollar Gen. Corp.*, 2001 WL 878887, at *4 (M.D. Tenn. May 23, 2001). It is the duty of employers to control employees' work time so that if it does not want the work to be performed, it must stop it from being performed. The Department of Labor's regulations are explicit regarding an employer's duty to control employees' work hours:

> **§ 785.13 Duty of Management**
>
> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. ***The mere promulgation of a rule against such work is not enough.*** Management has the power to enforce the rule and must make every effort to do so.
>
> 29 C.F.R. § 785.13 (emphasis added).

"Any employer 'who is armed with knowledge that an employee may be working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation even if the employee does not make a claim for overtime compensation.'" *Cunningham v. Gibson Elec. Co., Inc.*, 43 F.Supp.2d 965, 975 (N.D. Ill. 1999) (quoting *Newton*

*v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995).

The courts also have had no difficulty applying these principles to reject employers' attempts to defend against the failure to pay overtime by claiming that employees did not fill out the proper time records, or that they violated an employer's rule or agreement with the employer against working overtime.  For example, in *Burry v. National Trailer Convoy, Inc.*, 338 F.2d 422, 426 (6th Cir. 1964), the employer unsuccessfully argued that the employees could not recover unpaid overtime because their written contract prohibited them from working over 40 hours a week without the employer's written consent and because their time sheets showed 40 hours.

Whether Defendants were aware that Plaintiffs were working off the clock, and whether the activities in which Plaintiffs engaged constituted compensable work, are not defenses as much as they are challenges to Plaintiffs' proof.  Ultimately, an employer is liable for work performed by its employees, whether it is actual or constructive knowledge that the work is performed.  *See Brennan*, 482 F.2d at 827; *Dept. of Conservation and Natural Resources*, 28 F.3d at 1082 (quoting *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969)).

Moreover, as previously stated, Mr. Gonzalez was not the first employee claiming unpaid wages for work performed off-the-clock; Defendants acknowledge that two other employees working at stores located in Michigan had also complained about off-the-clock violations to the DOL, which prompted a desire on part of the DOL to investigate Advance America on a nation-wide basis throughout its 2,800 stores.

**b.  *De Minimis***

The doctrine that "*de minimis* overtime" should not be compensated does not apply to the case at bar.  The *de minimis* rule provides that an employer, in recording working time, may

disregard "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes." *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407 (5th Cir. 1990) (citing 29 C.F.R. § 785.47). As the Defendants well know, the *de minimis* rule applies <u>only</u> where the time involved is of a few seconds or minutes duration, <u>and</u> where the failure to count such time is due to … industrial realities. *Id.* An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him as part of his job. *Id.* Setting aside the fact that Defendants have misstated several Plaintiffs' testimony, its suggestion that the *de minimis* rule applies herein raises serious concern and doubt about its defenses in general.

Finally, no Plaintiff seeks only a few seconds or even a few minutes of overtime pay. Plaintiffs have testified that they are owed hours of work off the clock per week (See, e.g., Exhibit A: Francisco Gonzalez Dep. at 50-54; Edward Peterson Dep. at 91; Chloe Meeks Dep. at 22, 23; Crystal Coco Dep. at 34-37; Marivel "Coty" Hernandez Dep. at 25, 26; Ridgeno Lousteau Dep. at 22-24; Sabrina Herrera Dep. at 13-20; Denise Nicole Bean Dep. at 32-37; Janet Nelson Dep. at 16-17 (all indicating that the amount of time worked off-the-clock amounted to hours per week, and not just minutes or seconds). Accordingly, Defendant's Motion should be denied on this ground.

### c.  Statute of limitations.

Again, Defendants may intend to assert this defense at trial against one or two of opt-ins, which cannot be grounds for decertification, especially given that the Court has yet to rule on the issue of whether a 2-year or a 3-year statute of limitations will apply (a determination most likely to be made at or after a trial on the merits).

### d. Mr. Greg Zachary was not always a salaried employee.

Once again, Defendants tell half the story, perhaps because only half suits its argument. Mr. Greg Zachary was not always compensated on a salary basis. In fact, he was paid on an hourly basis as a Center Manager for Advance America, and became salaried only when he was promoted to Area Manager (Exhibit A: Greg Zachary Dep. at 22, ll. 3-8). This defense thus may not be applicable for the period when Mr. Zachary was a Center Manager, a fact that Defendants conveniently failed to mention.

## C.    Fairness and procedural considerations support moving forward with the collective action.

### 1.    Considerations of fairness support maintaining this collective action.

The FLSA is a remedial statute:

> The Fair Labor Standards Act of 1938 was enacted by Congress to be a broadly remedial and humanitarian statute. The Act was designed to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers …"

*Donavan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984).

The Court must "consider whether certification would serve the purposes and putative benefits of a collective action under §216. *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997). In *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989), the Supreme Court clearly articulated that purpose: "A collective action allows … Plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity." Taken together, these purposes weigh heavily against Defendant's motion to decertify the class and dismiss the opt-in Plaintiffs to pursue their claims independently. *See, Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001) (mindful of

the broad remedial purposes of the ADEA, as well as the fact that the "similarly situated" requirement of section 216(b) does not compel the Plaintiffs to meet the predominance prerequisite of Rule 23(b)(3), the Court has viewed the picture painted by Plaintiffs as a whole and finds that a collective action is appropriate for the liability phase of the Plaintiffs' claim.").

    **2.   The court has the necessary means to ensure a manageable trial.**

Plaintiffs have established that individual Plaintiffs are similarly situated.  However, to the extent the Court is concerned about managing the case, it has procedural tools at its disposal to make the case more manageable such as the use of representative testimony, bifurcation, and the creation of subclasses (which the Court has already done by separately classifying the CMs, AMs, and CSRs).

In essence, Defendants argue that collective actions are inappropriate where each Plaintiff's claims will require individualized determinations, and that Defendants have the opportunity to defend themselves against so-called individual claims, and that the need for mini-trials rules out collective action treatment for Plaintiffs.  The notion that no representative testimony should be allowed in this action is out of step with the reality of the facts of this case, the necessities of trying an FLSA case, and the weight of authority on the subject.

The reality is that any large FLSA case, where identifiable practices or patterns exist, should be tried with representative testimony to conserve judicial resources. *See, e.g., National Electro-Coatings, Inc. v. Brock*, 1988 U.S. Dist. LEXIS 16937 (N.D. Ohio) (courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985) (noting that "[c]ourts have frequently granted back wages under the FLSA to non-testifying employees based upon the representative testimony of a small percentage

of the employees" and that testimony need only "be fairly representational"); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (testimony of 8 of approximately 300 employees, or 2.7% of group, sufficient to establish entitlement to recovery under the FLSA).

### 3. Bifurcation

In addition, Fed. R. Civ. P. 42(b), "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," may order separate trials of any claims or of any separate issues. If it becomes clear to the Court that bifurcation of the liability from damages issues would further judicial economy, that tool is certainly at its disposal. Plaintiff believes that liability in this case turns on the issue of whether or not off-the-clock work was performed, which is the common element among all opt-in plaintiffs and Plaintiff Gonzalez.

### 4. Subclasses

Furthermore, the Court may find it expeditious to create a separate subclass for any distinct groups that it foresees raising separate issues at the liability or damages stages of the trial. To an extent, this has already taken place in that the class originally granted includes three subclasses – CM, AM, and CSR.

In sum, this Court has at its disposal all the necessary procedural tools to ensure the trial of this collective action proceeds in both a fair and manageable manner.

### VIII.   CONCLUSION

Plaintiff Francisco Gonzalez and the opt-in Plaintiffs meet their burden to show that they are similarly situated, and that they were together victims of a unified practice that necessitated that they work off the clock in order to complete their duties. Therefore, Plaintiff and opt-in Plaintiffs respectfully ask the Court to deny Defendant's Motion to Decertify Collective Action.

Plaintiff attaches a proposed Order.

Respectfully submitted:

**MOORE & ASSOCIATES**

By:  /s/ Melissa Moore
    Melissa Moore
    Federal Id. No. 25122
    State Bar No. 24013189
    Rochelle Owens
    Federal Id. No. 590507
    State Bar No. 24048704
    Lyric Centre
    440 Louisiana, Suite 710
    Houston, TX 77002
    Telephone:    (713)222-6775
    Facsimile:    (713)222-6739


**ALI  S. AHMED, P.C.**

By: /s/ Salar Ali Ahmed
    Salar Ali Ahmed
    Federal Id. No. 32323
    State Bar No. 24000342
    One Arena Place
    7322 S.W. Freeway, Suite 1920
    Houston, Texas 77074
    Telephone:    (713) 223-1300
    Facsimile:    (713) 255-0013

**ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was forwarded to Defendant's counsel on December 21, 2009, via certified mail, return receipt requested and addressed as follows:

Mr. Justin Flamm
TAFT STETTINIUS & HOLLISTER, LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957


By: /s/ Salar Ali Ahmed
    Salar Ali Ahmed