**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **FRANCISCO J. GONZALEZ,** *et al.* | § | |
| | § | |
| | § | |
| **versus** | § | **CIVIL ACTION NO. H-07-2941** |
| | § | |
| **ADVANCE AMERICA, CASH ADVANCE** | § | |
| **CENTERS OF TEXAS, INC.,** *et al.* | § | |

## O R D E R

Pending before the Court is Defendants' Motion for Summary Judgment and Defendants'
Motion to Decertify Collective Action. **(Instrument Nos. 162, 163)**.

### I.

### A.

Plaintiff Francisco J. Gonzalez ("Plaintiff" or "Gonzalez") brings suit on behalf of himself,
and all others similarly situated, against Defendants Advance America, Cash Advance Centers of
Texas, Inc., Cash Advance Centers Inc., Ken E. Compton, and Robert Show (collectively "Advance
America" or "Defendants") alleging a collective action suit to recover unpaid overtime wages under
the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and the Texas Pay Day Act, Tex.
Lab. Code § 61 (2007). (Instrument No. 1, at 1).

### B.

Plaintiff Francisco Gonzalez was employed by Defendants from May 2006 through October
25, 2007. (Instrument No. 18, at 1, 4). Defendants own and operate over 2,800 loan offices
throughout the United States. (Instrument No. 164, at 7). Plaintiff served as a Center Manager for
one of Defendants' loan offices in Houston, Texas. Customer Service Representatives and Assistant
Managers generally reported to Center Managers, such as Plaintiff. (*Id.*, at 8). Center Managers, in

turn, reported to Divisional Directors of Operation ("DDO").  (*Id.*).  Plaintiff reported to Daniel Amazega ("Amazega"), a DDO.  (*Id.*).  Plaintiff's duties as a Center Manager included: "maintaining effective operation and continued growth of the loan office . . .; budget control; employee relations; leadership; training; product knowledge; marketing; collections; customer service; data entry; phone calls; center appearance; and local travel." (Instrument No. 164, at 9).  Throughout his employment, Plaintiff was classified as a non-exempt employee and was paid an hourly wage of $13.40. (Instrument No. 18, at 5; Instrument No. 164, at 8).

Advance America maintains an official policy requiring all employees to "clock in" prior to performing any work.  (Instrument No. 163-1, at 33, 39, 41).  The policy states that "[w]orking off the clock at any time for any reason is strictly prohibited. . . It means that absolutely no work may be performed before clocking in or after clocking out." (*Id.*).  The policy further requires employees working a full shift to take a lunch break of a minimum duration of thirty minutes.  (*Id.*).  Finally, the policy notes that employees who are "asked or encouraged to work off the clock" should call the established Employee Relations Hotline.  (*Id.*).

Plaintiff alleges that Defendants required him to work overtime hours in excess of forty hours per week, but that Advance America discouraged him from reporting these overtime hours and did not compensate him for these hours.  (Instrument No. 18, at 4-5).  Plaintiff maintains that Defendants had an unwritten and unofficial policy of encouraging or allowing Center Managers, Customer Service Representatives, and Assistant Managers to work off-the-clock in order to complete all their duties.  Plaintiff contends that he worked off-the-clock because he "could report no more than forty-two hours  a week," and believed that he would risk losing his job if he did.  However, Plaintiff states that he needed to work overtime in order to complete all his job duties.  (Instrument No. 164, at 9).

Plaintiff states that he generally reported an eight-hour shift on Mondays and Tuesdays, a ten-hour shift on Thursdays and Fridays, and a four-hour shift on Saturdays. (Instrument No. 164-1, at 2). Plaintiff alleges that he reported to the center approximately forty-five minutes to one hour prior to opening it each day, but he did not report and was not paid for this time. (*Id.*). Plaintiff further argues that he was required to make collection calls to customers after normal business hours, but he did not report and was not paid for this time. (*Id.*). Finally, Plaintiff claims that he was required to clock-out each day for a thirty-minute lunch break, but that he often worked during some or all of this time. Amazega, a DDO and Plaintiff's direct supervisor, confirmed that employees, including Plaintiff, worked off-the-clock to complete their job duties. (Instrument No. 167-1, at 6).

## C.

On September 12, 2007, Plaintiff originally filed this action on behalf of himself, and all others similarly situated, against Defendants alleging a collective action suit to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and the Texas Pay Day Act, Tex. Lab. Code § 61 (2007). (Instrument No. 1, at 1). Plaintiff amended his complaint on November 16, 2007 and Defendants answered on January 4, 2008. (Instrument Nos. 18, 23). Plaintiff asserts that Advance America, his former employer, required him to work overtime hours in excess of forty hours per week, but discouraged him from reporting these overtime hours and did not compensate him for these hours. (Instrument No. 18, at 1, 4).

On June 12, 2008, Plaintiff filed a Motion for Class Notice and Expedited Discovery. (Instrument No. 33). Plaintiff moved the Court to authorize notice to potential plaintiffs and expedite discovery to determine the identities of employees who were denied overtime pay from September 12, 2004 through the present. (*Id.*, at 2, 16).

3

After a hearing on October 17, 2008, the Court granted conditional class certification of all salaried and hourly paid employees of Defendants who were center managers, assistant center managers, and customer service representatives after October 17, 2005. The Court ordered Defendants to provide Plaintiff "the names, addresses, and dates of birth of all potential salaried and hourly paid current and former employees of Defendants who were center managers, assistant center managers and customer service representatives in the metropolitan area of Houston, Texas from October 17, 2005 to the present." (Instrument No. 65). Defendants were also ordered to include the store number and address of the store at which each employee was employed. (*Id.*).

During the specified period, sixty-two individuals timely submitted and filed opt-in consent forms. (Instrument No. 162, at 6). Plaintiff and Defendants conducted written discovery and deposed twenty-two opt-in plaintiffs. (*Id.*).

Defendants filed a Motion for Summary Judgment on December 1, 2009, arguing that Plaintiff Francisco Gonzalez, the only named plaintiff in the lawsuit, has failed to establish a *prima facie* case under the FLSA. (Instrument No. 163). Defendants argue that Advance America has a policy prohibiting off-the-clock work, and assert that Gonzalez personally understood these policies. (*Id.*, at 5-6). Defendants state that Advance America does not prohibit overtime hours, but requires that an employee get supervisor authorization before working overtime hours. (*Id.*, at 7). Only unapproved overtime hours are allegedly prohibited. (*Id.*). Defendants claim that Gonzalez did not seek supervisor approval for his overtime hours, and that Advance America temporarily assigned employees from other centers so that Gonzalez could take time off. (*Id.*, at 8). Defendants argue that Gonzalez cannot establish a *prima facie* case under the FLSA because Gonzalez prevented Advance America from knowing about the overtime hours he worked and because he cannot establish the

4

"amount and extent" of overtime hours he worked. (*Id.*, at 9-11). Finally, Defendants object to the admissibility of Plaintiff's sworn affidavit.

Defendants also filed a motion to decertify the collective action on December 1, 2009. (Instrument No. 162). Defendants reiterate Advance America prohibited "off the clock" work. Although overtime hours were not prohibited, employees were expected to seek supervisor approval from their direct supervisor when overtime was necessary. (*Id.*, at 8-9). Defendants also claim that deposition testimony confirms that employees were not encouraged to work off the clock, and that they were compensated time-and-a-half for all the hours they "submitted - including overtime hours." (*Id.*, at 11-12). Defendants argue that the deposition testimonies of various opt-in plaintiffs reveals that they had "a wide range of differing experiences in their employment." (*Id.*, at 14). Defendants assert, for example, that several opt-in plaintiffs admitted doing no work off the clock. Defendants argue that some opt-in plaintiffs testified that they were not required to do one hour of off-the-clock work every morning, as Plaintiffs alleged; other opt-in plaintiffs allegedly testified that they were not required to work off-the-clock at the end of the work day. (*Id.*, at 15-16). Defendants also assert, contrary to Plaintiff's allegations, that many opt-in plaintiffs took uninterrupted lunch breaks and were not required to work after-hours, or they were paid if they did work during these times. (*Id.*, at 17-18). Defendants contend that only unapproved overtime was strongly discouraged, and that some opt-in plaintiffs worked overtime because of their own time-management problems. (*Id.*, at 19-20). Finally, Defendants assert that they have different defenses for various opt-in plaintiffs. (*Id.*, at 21

Plaintiff responded to Defendants' Motion for Summary Judgment on December 21, 2009. (Instrument No. 164). Plaintiff states that he often worked off-the-clock, even though he knew he

could not report more than forty-two hours per week, because of the "pressures of completing all of his job duties . . . ." (*Id.*, at 9). Plaintiff notes that his direct supervisor confirmed that it took more than forty hours per week to get his job done. (*Id.*, at 10). Plaintiff argues that he has established a *prima facie* case under the FLSA because his own supervisor admits that he knew that employees worked off-the-clock. (*Id.*, at 15-16). Plaintiff contends that he is not required to have an exact account of the off-the-clock hours worked, and that "Advance America made it impossible to report all the hours [he] actually worked as overtime was strongly discouraged . . . ." (*Id.*, at 18). Plaintiff alleges that Defendants' failure to allow the accurate portrayal of hours actually worked illustrates their inability to maintain complete and accurate records. (*Id.*, at 20). Plaintiff claims that his summary testimony regarding the estimated average hours worked per day and the estimated average days worked per week is sufficient to meet his burden. (*Id.*).

Plaintiff also responded to Defendants' Motion to Decertify Collective Action on December 21, 2009. (Instrument No. 165). Plaintiff argues that the opt-in plaintiffs consistently testified that they were under "tremendous pressure to work overtime hours without getting paid for those hours" and that "Advance America's management pressured them to complete their job duties within forty to forty-two hours a week, a goal that was not realistically achievable." (*Id.*, at 8). Plaintiff states that while Advance America had a "policy of discouraging overtime hours and work performed off-the-clock, there was a simultaneous unwritten policy that imposed mandatory operating hours and disciplining employees for failing to perform work outside of those hours." (*Id.*, at 10). Plaintiff claims that Advance America encouraged or allowed Center Managers, Customer Representative Managers, and Assistant Managers to work off-the-clock to perform all of their duties. (*Id.*, at 12). Plaintiff maintains that Advance America's unwritten policy also held that any employee who reported

more than forty-hours per week would be disciplined, and that opt-in plaintiffs were threatened with termination for reporting overtime hours.  (*Id.*, at 8-13).  Plaintiff asserts that however, the job duties of Advance America's employees were not achievable in forty-two hours per week.  (*Id.*, at 13, 16-20).  Plaintiff argues that the opt-in plaintiffs are similarly situated in terms of their job titles, descriptions, duties, and training.  (*Id.*, at 18).  Finally, Plaintiff states that Defendants' purported defenses are not individualized and are without merit.  (*Id.*, at 20).

Defendants replied to Plaintiff's response to Defendants' Motion for Summary Judgment on January 4, 2010.  (Instrument No. 167).  Defendants claim that Plaintiff misstates deposition testimony in his response brief, and that his references to other employees are irrelevant to the issues at hand.  (*Id.*, at 2-3).  Defendants reiterate that Plaintiff cannot establish a *prima facie* case under the FLSA because he cannot show that his employer knew about his off-the-clock work and because he cannot recall when he worked off-the-clock.  (*Id.*, at 4).

Finally, Defendants replied to Plaintiff's response to Defendants' Motion to Decertify Collective Action on January 4, 2010.  (Instrument No. 166).  Defendants claim that Plaintiff ignores the evidence of "drastic differences among the opt-in plaintiffs" and the contradictions between the evidence and the allegations made in his June 12, 2008 Motion to Class Notice.  (*Id.*, at 2-4).  Defendants argue that the evidence has established Advance America's uniform policy of wage and pay compliance, such as the policy to pay employees for all the time worked, including all overtime hours.  (*Id.*, at 5).

## II.

### A.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also U.S. v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248. If the evidence rebutting the motion for summary judgment is only colorable or is not significantly probative, summary judgment should be granted. *See id.* at 2511; *see also Thomas v. Barton Lodge, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999). The summary judgment procedure, therefore, enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886-88 (1990).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward 'with specific facts showing that there is a *genuine issue for trial.*'"

*Matsushita*, 475 U.S. at 586-87 (quoting FED. R. CIV. P. 56(e)) (emphasis in original).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir. 1995).  To sustain the burden, the nonmoving party must produce evidence admissible at trial.  *See Anderson*, 477 U.S. at 242; *see also Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) (stating that "[t]o avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue.").

The Court reviews the facts in the light most favorable to the nonmovant and draws all reasonable inferences in favor of the nonmovant.  *See Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## B.

Defendants argue that the Court should view Plaintiff's sworn affidavit as an attempt to create sham issues of fact.  (Instrument No. 163, at 12).  Defendants claim that Plaintiff, at his deposition, effectively recanted many of the facts asserted in the affidavit.  (*Id.*).

Upon a review of the evidence, the Court does not find that Plaintiff's sworn affidavit directly contradicts his deposition testimony.  Accordingly, the Court declines to strike Plaintiff's sworn affidavit.  Any issues of credibility or weight of the evidence are not for the Court to decide, and may be resolved at trial.  *Caboni v. GMC*, 278 F.3d 448, 451 (5th Cir. 2002) (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).  Defendants' objections to the admissibility of Plaintiff's sworn affidavit are **DENIED**.

## C.

The overtime provisions of the Fair Labor Standards Act state that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA is a remedial statute and the extent of its coverage is to be construed liberally. *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296-97 (1985); *Rodriguez v. Township of Holiday Lakes*, 866 F. Supp. 1012, 1017 (S.D. Tex. 1994). Accordingly, courts define the terms "employee" and "employer" expansively and construe coverage exemptions narrowly in favor of employees. *Rodriguez*, 866 F. Supp. at 1017. The FLSA provides that

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee received compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The Fifth Circuit has determined that the FLSA employer definition includes "an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (quoting *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 196 (5th Cir.), *cert. denied*, 463 U.S. 1207 (1983)).

Defendants argue that Plaintiff cannot establish a *prima facie* case under the FLSA, because Advance America did not know about the overtime hours Plaintiff worked and because he cannot establish the "amount and extent" of overtime hours he worked. (Instrument No. 163, at 9-11). The Court addresses both below.

### 1.

Defendants first assert that Plaintiff cannot establish a *prima facie* case under the FLSA because Plaintiff prevented Advance America from knowing about the overtime hours he worked. (Instrument No. 163, at 9-11). Defendants state that Plaintiff "took it upon himself to work extra hours, which he alone decided not to report". (*Id.*) Defendants further claim that he "consciously subverted Advance America's mandate that all hours be reported, with the result that Advance America did not know of the situation and was unable to correct it. (*Id.*). Plaintiff retorts that his own supervisor, Amazega, testified that he knew that Plaintiff worked off-the-clock. (Instrument No. 164, at 15-16).

Under the FLSA, an employee is "employed" during alleged overtime hours if an employer has actual or constructive knowledge that the employee was working. *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (citing *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)). "An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Id.* (citing *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)). "The employer who wishes no such work to be done has a duty to see it is not performed. He cannot accept the benefits without including the extra hours in the employee's weekly total for purposes of overtime compensation." *Prince v. MND*

*Hospitality, Inc.*, Civil Action No. H-08-2617, 2009 U.S. Dist. LEXIS 61637, at *19-21 (S.D. Tex. July 20, 2009) (citing *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir.1997)).   An employer cannot escape liability for uncompensated overtime work of which the employer has actual or constructive knowledge merely by prohibiting overtime labor because an employer's "mere promulgation of a rule against such work is not enough." *Id.* (citing *Reich v. Dept. of Conservation & Natural Res., St. of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994).   Because "an employer's knowledge is measured in accordance with his duty to inquire into the conditions prevailing in his business," cases "must be rare where prohibited work can be done and knowledge or the consequences of knowledge avoided." *Id.*

An employee cannot perform overtime work without the employer's knowledge or contrary to its instructions and then assert a right to be paid.   If "the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." *Prince*, 2009 U.S. Dist. LEXIS 61637, at *19-21 (citing *Harvill*, 433 F.3d at 441).   However, an employee is not estopped from claiming additional overtime if the Court found that the employer knew or had reason to believe that the reported information was inaccurate.  *Id.* Additionally, the Fifth Circuit has denied summary judgment when the employee's approved duties routinely required extra hours, outside the scheduled shifts. *Prince*, 2009 U.S. Dist. LEXIS 61637, at *31-32 (citing *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973)).

Here, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Advance America had actual or constructive knowledge that Plaintiff was working off-the-clock.

**2.**

Defendants also claim that Plaintiff cannot establish a *prima facie* case under the FLSA

because Plaintiff cannot establish the "amount and extent" of overtime hours worked. (Instrument No. 163, at 9-11). Defendants states that Plaintiff "cannot even remember at what point in his roughly seven-month tenure with Advance America he first chose to do off-the-clock work." (*Id.*, at 11). Plaintiff retorts that he is not required to have an exact account of his off-the-clock hours worked, and that "Advance America made it impossible to report all the hours they actually worked as overtime was strongly discouraged . . . ." (Instrument No. 164, at 18). Plaintiff claims that his summary testimony regarding the estimated average hours worked per day and the estimated average days worked per week is sufficient to meet his burden. (*Id.*).

An employee bringing an FLSA claim for unpaid overtime compensation must demonstrate that he has performed work for which he alleges he was not paid. *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). An employee has met this burden of proof if he proves that he has performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *Id.* Then, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Id.*

A plaintiff need not "prove each hour of overtime work with unerring accuracy or certainty." *Prince*, 2009 U.S. Dist. LEXIS 61637, at *15-16 (quoting *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988)). "In a FLSA case, in the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct." *Id.*

Here, the Court finds that Plaintiff has provided sufficient summary evidence to establish a just and reasonable inference of the amount and extent of hours worked. Defendants have not come

forward with evidence of the precise amount of hours worked by Plaintiff or with evidence to negate the reasonableness of the inference to be drawn from Plaintiff's evidence.  Accordingly, Defendants' motion for summary judgment is **DENIED.  (Instrument No. 164).**

### III.

### A.

Section 207(a) of the FLSA requires covered employers to compensate non-exempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a). Section 216(b) of the FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated" to recover unpaid overtime wages. 29 U.S.C. § 216(b).  Section 216(b) further provides, however, that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* A representative action brought pursuant to this provision follows an "opt-in" rather than an "opt-out" procedure by facilitating notice to potential plaintiffs. *See Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). District courts have the discretion to allow a party asserting FLSA claims on behalf of others to notify potential plaintiffs that they may choose to "opt-in" to the suit. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

In order to determine whether opt-in plaintiffs are "similarly situated," the Court has adapted the Fifth Circuit's two-step approach found in *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465-66 (D.N.J. 1988) and the rule 23 class certification approach outlined in *Shushan v. University of Colorado*, 132 F.R.D. 263 (D. Colo. 1990). The Fifth Circuit outlined the *Lusardi* approach as follows:

Under *Lusardi*, the trial court approaches the "similarly situated" inquiry via a two-step analysis. The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision – usually based only on the pleadings and any affidavits which have been submitted – whether notice of the action should be given to potential class members.

Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives--i.e. the original plaintiffs--proceed to trial on their individual claims.

*Mooney*, 54 F.3d at 1213-14 (internal citations omitted).

In determining whether notice to putative class members was appropriate, the Court assessed whether there are other employees "who are similarly situated with respect to their job requirements and with regard to their pay provisions." *Clarke*, 370 F. Supp. 2d at 605 (quoting *Dybach v. Fla. Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). "Similarly situated does not mean identically situated. Rather, an FLSA class determination is appropriate when there is a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]." *Id.* (quoting *Helmerich and Payne Int'l Drilling Co.*, Civil Action No. 92-0043, 1992 U.S. Dist. LEXIS 5367, at *4-5 (E.D. La. April 16, 1992)). This standard has been restated and further refined in *H&R Block v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999):

15

> [A]lthough the standard for satisfying the first step is lenient . . . the court still requires at least "substantial allegations that the putative class members were together victims of a single decision, policy or plan infected by discrimination." Courts who have faced the question of whether movants established substantial allegations have considered factors such as whether potential plaintiffs were identified . . .; whether affidavits of potential plaintiffs were submitted . . .; and whether evidence of a widespread discriminatory plan was submitted . . .

Here, the Court granted conditional class certification of all salaried and hourly paid employees of Defendants who were center managers, assistant center managers, and customer service representatives after October 17, 2005.

Following discovery, the Court enters the second phase of the *Lusardi* analysis. With the aid of information gained in discovery, the Court considers if the opt-in plaintiffs are "similarly situated" to the named plaintiff. If they are, the representative action may proceed. If they are not, the class is decertified, the opt-in plaintiffs are dismissed, and the original named plaintiff may proceed with his own claims only.

At this second stage, the burden is on the Plaintiff to prove that the individual class members are similarly situated. *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280-281 (N.D. Tex. 2008) (citing *Bayles v. Am. Med. Response of Col., Inc.*, 950 F. Supp. 1053, 1062-63 (D. Colo. 1996); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003)). Because the parties have been able to conduct discovery, the similarly-situated inquiry at the second stage is much more stringent. *Id.* (citing *Harris v. FFE Transp. Servs., Inc.*, NO. 3:05-CV-0077-P, 2006 U.S. Dist. LEXIS 51437, at *7-8 (N.D. Tex. May 15, 2006)). The Court considers several factors at this stage in the analysis, including: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Mooney*, 54 F.3d at 1213 n.7 (citing *Lusardi*, 118 F.R.D.

at 359).

While the plaintiff must show that putative class members are "similarly situated," this does require that they be"identically situated." *Proctor*, 250 F.R.D. at 280-281 (citing *Helmerich*, 1992 U.S. Dist. LEXIS 5367, at *2). Instead, the question is if there is "a demonstrated similarity among the individual situations ... some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice.]" *Id.* (citing *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1998)). Decertification is proper if"the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Burt v. Manville Sales Corp.*, 116 F.R.D. 276, 277 (D. Colo. 1987).

The Court must also consider if it can coherently manage the class in a manner that will not prejudice any party. *Lusardi*, 118 F.R.D. at 360. If there is "no single decision, policy, or plan" that affects the putative class members, the case will encounter manageability problems and the motion to decertify should be granted. *Id.*

## B.

Plaintiff contends that all putative class members are similarly situated because they shared the same job titles, job descriptions, job duties, and were subject to identical company policies. (Instrument No. 165, at 11). Plaintiff states that all opt-in plaintiffs were affected by Defendants' overarching unofficial policy of encouraging or allowing employees to work off-the-clock. (*Id.*, at 11-12). Plaintiff argues that the job duties of Advance America's employees were not achievable in forty to forty-two hours per week. Plaintiff asserts that employees were pressured to work off-the-clock because employees were discouraged from reporting more than forty-two hours in a work week. (*Id.*, at 13-15).

Defendants, on the other hand, maintain that Plaintiff has failed to meet his burden of showing that all putative class members are similarly situated. (Instrument No. 162, at 14). Rather, Defendants contend that putative class members had a wide range of differing experiences in their employment with Advance America. (*Id.*). First, Defendants state that several of the opt-in plaintiffs admitted to doing no off-the-clock work during the relevant time. (*Id.*, at 15-16). Second, Defendants claim that some opt-in plaintiffs testified that they never arrived early at work each morning to perform off-the-clock work, contrary to Plaintiff's sworn affidavit. (*Id.*, at 16-17). Third, Defendants argue that many opt-in plaintiffs took uninterrupted lunch breaks or were paid for their lunchtime work, contrary to Plaintiff's assertions. Fourth, Defendants claim that all opt-in plaintiffs were not unpaid for collection visits made to their customers after normal business hours, if any. Fifth, Defendants state that some opt-in plaintiffs testified that they were compensated for all hours worked, which refutes Plaintiff's assertion of an unofficial policy prohibiting overtime work. Finally, Defendants argue that weekly hours in excess of forty were not unavoidable, and that some of the opt-in plaintiffs worked off-the-clock because they suffered from time-management problems.

Plaintiff must show that putative class members were affected by a common policy, plan, pattern or practice in order to proceed collectively under Section 216(b) of the FLSA. There must be "meaningful identifiable facts or legal nexus [that] bind the claims." *Falcon v. Starbucks Co.*, 580 F. Supp. 2d 528, 535 (S.D.Tex. 2008) (citing *Simmons v. T-Mobile*, No. H-06-1820, 2007 WL 3526669, at *8 (S.D.Tex. Jan. 24, 2007)). "A court may deny plaintiff's right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *Aguirre v. SBC Communications, Inc.*, No. Civ. Action H-05-3198, 2006 WL 964554, at *5 (S.D. Tex. April 11, 2006); see *O'Brien v. Ed Donnelly Enterprises,*

*Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006) ("Plaintiffs must demonstrate that the Defendants had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in Plaintiffs.").

Here, the Court finds that Plaintiff has met their burden of demonstrating that putative class members are similarly situated and that there is a meaningful factual or legal nexus binding their claims. Although the putative class members worked at different stores under the supervision of different individuals, there is no dispute that they shared similar job titles, descriptions, and duties. (Instrument Nos. 165-5, 165-6, 165-7). Additionally, parties do not dispute that Advance America maintained an official policy requiring employees to report all hours worked, and to not work off-the-clock.

However, Plaintiffs have provided substantial evidence demonstrating that Advance America also maintained an internal policy discouraging overtime work. (Instrument No. 165-1, at 10). Amazega testified that when he was trained for his position, Advance America instructed him to discourage employees from reporting more than two hours of overtime per week. (Instrument No. 165-2). Greg Zachary ("Zachary"), an Area Manager for Advance America, similarly testified that Advance America sought to limit their expenses by limiting overtime hours. (Instrument No. 165-2). He stated that "overtime was a curse word . . . They just didn't want to hear about it." (*Id.*). Zachary further testified that managers were directed to schedule employees to work thirty-nine hours per week, so that even if employees had to work late on occasion, they would not report overtime. (Instrument No. 165-2). Willette Curtis ("Curtis"), an opt-in plaintiff, testified that she was specifically instructed not to report overtime hours. (Instrument No. 165-4, at 8). Edward Peterson ("Peterson"), another opt-in plaintiff, stated that Advance America "put the stifle on overtime pay"

19

in 2006.  He said, "We couldn't do no more than two hours of overtime. . . . Anything over that they would definitely get on us about that, including up to written warnings and so forth."  Finally, when an employee reported too many hours as a week progressed, and Advance America felt that the employee may work overtime that week, Advance America often requested that another employee from another center substitute, in an effort to avoid or reduce overtime hours.  (Instrument Nos. 165-1, 165-2).  This evidence only further establishes Advance America's internal commitment to limit overtime hours by its employees.

Deposition testimony further establishes that employees feared reprimand and possible termination if they reported more than two overtime hours per week.  Amazega testified that employees "didn't want to have overtime" because if they did, they risked getting "yelled at or getting an email or getting a memo."  (Instrument No. 165-2).  Marivel Hernandez ("Hernandez") testified that she was personally threatened with discipline when she recorded overtime hours.  (Instrument No. 165-3, at 4).  Hernandez worried that she would get written up or terminated for recording too many overtime hours.  (*Id.*, at 5).  Curtis testified that she was disciplined and received a "write-up" for reporting overtime hours.  (Instrument No. 165-4, at 8).  Cheritha Robinson ("Robinson") testified that she feared losing her job if she reported overtime.  (Instrument No. 165-4, at 10).  Edward Peterson ("Peterson") confirmed that employees could receive written warnings for reporting more than two hours of overtime per week.  (Instrument No. 165-4, at 13).  Finally, Lakeitha Robert ("Robert"), an opt-in plaintiff, testified that she was verbally reprimanded for recording overtime hours, because her store was "only budgeted" a certain amount of hours per week.  (Instrument No. 165-4).

A policy of discouraging overtime, by itself, is not a violation of the FLSA.  " Where such a policy, however, in combination with other factors, leads to a consistent pattern of FLSA violations, it can support a finding that Plaintiffs are similarly situated for purposes of [the FLSA]." *Falcon*, 580 F. Supp. 2d at 536.  Here, the evidence establishes that Advance America employees also felt pressure to meet performance goals established by the company.  Stores were given certain collection goals and marketing goals.  Amazega testified that if store managers did not reach these goals, they could be considered to be "underperforming."  (Instrument No. 165-2).  He elaborated that employees were under pressure to "meet an expectation" and "run their numbers, make their numbers."  (Instrument No. 165-2).  Amazega stated that each center had "so many things that had to get done. [If an employee] failed an audit I'm sure you know it gonna be on him.  And then at the end it was going to be on me . . . ."  (*Id.*).  In addition, Plaintiff testified that he faced pressure to "place [his] center financially in the correct place.  Consequently, I had to do work outside the schedule in order to be able to do the collections and whatever had to be done."  (Instrument No. 165-1).

Zachary testified that Advance America sought to "let [employees] know that their employment would be in danger if their performance continued to lag."  He said that "there was . . . a lot of pressure to make sure that all those phone calls, all your collections were done. . . ."  (Instrument No. 165-2).  He further stated that employees could not "go home until all [their] collection calls were done. It [they] did, then [they] were held accountable for [their] performance going down."  (Instrument No. 165-2).  Robert similarly testified that each center was given a collection goal and budget to meet. (Instrument No. 165-4).  "[Y]ou had to make sure that all your numbers come [sic] in line. . . [T]hey have a book . . . it's just what your store is doing for the day,

21

for the month, for the year. And you have to make sure those keep in line. And Advance America has set up what they expect for this particular center." (*Id.*). She stated that she faced considerable pressure to complete her tasks each week, and that there was a big emphasis on the "numbers." (*Id.*).

Along the same lines, deposition testimony demonstrates that Advance America employees were often unable to complete their job tasks and meet performance goals without working more than forty hours per week. Amazega clearly testified that "it took more than [forty] hours to get the job done . . . [and] employees were pressured to deliver a result." (Instrument No. 165-2). He further stated that without working overtime, employees "weren't going to be able to do everything [they] were supposed to do. If [employees] wanted to be successful . . . [they] had to put more than 40 hours." (*Id.*). Zachary similarly testified that the quantity of work assigned to a customer service representative was "not always" achievable in a forty-hour week. Hernandez testified that she worked off-the-clock because her supervisors suggested that she get her work done "by any means necessary." (Instrument No. 165-3). Peterson also testified that the "time allotted to do the tasks that was [sic] needed wasn't sufficient. And we had to work a lot more than normal to complete certain tasks." (Instrument No. 165-4, at 12).

In sum, the evidence demonstrates that Advance America maintained an internal policy strongly discouraging overtime hours. Plaintiffs also have demonstrated that employees experienced pressure to complete job tasks and meet performance goals, without reporting overtime hours. The Court finds that Advance America's conflicting signals created an environment that motivated managers to allow or encourage FLSA violations.

This is further established by evidence indicating that managers often "looked the other way" when their employees worked off-the-clock, and told their employees to "do what you have to do"

22

to complete their tasks without reporting overtime. Amazega testified that he "preached, you know, you guys need to do whatever it takes to get the job done." (Instrument No. 165-2). He further stated that Advance America's "working off the clock" policy was disregarded as a practical matter, because "they didn't really want managers to have a more [sic] than a couple hours of overtime and . . . [employees] have to do collections after hours [and work] extra hours. . . . [Employees would] rather just, you know, quietly get the job done rather than, you know, getting fired for under – not performing." (Instrument No. 165-2). He stated that he was aware that employees were working off-the-clock, but that he did not inquire further because he "didn't want to know." (Instrument No. 165-2). Zachary, an Area Manager, similarly testified that he enforced the company's official policy towards off-the-clock work only some of the time. "And other times you looked the other way." (Instrument No. 165-2). Zachary admitted that he knew about collections and field calls that occurred before or after an employees' work day. (*Id.*). He said that he chose to "look the other way . . . with the full acknowledge of [his] higher-up," when employees worked off-the-clock to meet performance goals and "make [their] numbers look better." (*Id.*).

Opt-in plaintiffs also testified that they were instructed to work off-the-clock by their supervisors. Sabrina Herrera ("Herrera") testified that she was instructed, by her supervisor, to clock out at a certain time, even when her supervisor knew that she still had work left to do in the day. (Instrument No. 165-3). Roderick Johnson ("Johnson") testified that he was instructed, by his supervisor, to clock out before completing his work. (Instrument No. 165-4, at 2). Peterson stated that he was told "not to report" more than a certain number of hours per week. (Instrument No. 165-4, at 16). However, he was also written up if he did not complete all the tasks assigned to him. (*Id.*, at 14). He said, "If we couldn't finish it, we'd better . . . that's on us" (*Id.*, at 14, 17). Finally,

Robert said that she was pressured to meet collection goals and was told by her supervisors "just to get it done." (Instrument No. 165-4).

Finally, a number of opt-in plaintiffs testified that they personally worked off-the-clock. Plaintiff testified that he was physically present at the center "many times" during which he was not paid for his time. (Instrument No. 165-1). Chloe Meeks ("Meeks") testified that she worked off-the-clock because she was "overwhelmed, overpushed." (Instrument No. 165-2). Crystal Coco ("Coco") stated that she frequently worked off-the-clock during her lunch break because Advance America viewed "customers as numbers." If a customer came to the center during her lunch break, she would "go and open the door for the customer," without clocking back in. (Instrument No. 165-2). She also testified that she performed "bank runs" and dropped items off at the post office after she clocked out at the end of her work day. (*Id.*). Finally, she stated that she was never compensated for her time when she had to drive between centers during the work day. (*Id.*).

Hernandez testified that she worked off-the-clock during lunch, in the mornings before clocking in, and in the evenings after clocking out. She said that she performed field calls, collection calls, and bank runs while off-the-clock. (Instrument No. 165-3, at 2). She arrived at work about one hour before clocking in every day, and stayed at her center for approximately one hour after clocking out. (*Id.*). Additionally, Herrera testified that she worked off-the-clock when she helped customers before her shift started, and when she did marketing and bank runs during her lunchtime. (Instrument No. 165-3). She also stated that she was not paid when she traveled between centers during the day. (*Id.*). Janet Nelson ("Nelson") testified that she worked off-the-clock when she did doing "store closing[s]," "field calls" and collecting funds. (Instrument No. 163). Johnson testified that he was instructed, by his supervisor, to clock out before completing his work for the day.

24

(Instrument No. 165-4, at 2). Finally, Terry Jackson ("Jackson") testified that he performed off-the-clock work within the first week of his employment at Advance America. (Instrument No. 165-4, at 4). He was asked to assist customers while on break, and was not paid for his time when he traveled from one center to another center during the day. (*Id.*, at 5)

Defendants argue that some opt-in plaintiffs were paid for recorded overtime hours in excess of forty-two hours per week. (*Id.*, at 19). However, Plaintiff is not required to prove that putative class members *never* reported overtime hours or were *never* paid for these hours. Defendants also argue that putative class members did not all work off-the-clock at the same times. Defendants point out that some opt-in plaintiffs did not work off-the-clock before clocking in each morning, some opt-in plaintiffs did not work off-the-clock during lunch, and some opt-in plaintiffs did not work off-the-clock after clocking out at the end of each day. The Court holds that Plaintiff is not required to prove that all putative class members worked off-the-clock in the same manner or the same times. The putative class members need not have had the exact same experience as Plaintiff. To meet his burden, Plaintiff is only required to establish a meaningful nexus that binds the claims of the putative class members, and that the similarities in their claims outweigh their differences. Plaintiff has met this burden.

Defendants also argues that some putative class members did not work off-the-clock at all. Upon a review of the evidence, the Court finds that one opt-in plaintiff, Wendy Garza ("Garza"), testified that she did no off-the-clock work in her time at Advance America. (Instrument No. 162-1, at 69). However, the Court does not find it necessary to decertify the entire class because of Garza's lone testimony. Accordingly, the Court ORDERS that Wendy Garza be removed from the class, and her claim is dismissed as a matter of law.

### C.

Defendants assert that their Motion for Decertification should be granted because Advance America has different defenses applicable from one opt-in plaintiff to the next. (Instrument No. 162, at 21). First, Defendants claim that not all of the opt-in plaintiffs informed their employer that they were working off-the-clock. (*Id.*, at 21-22). Second, Defendants argue that the *de minimis* doctrine applies to some of the opt-in plaintiffs, because these opt-in plaintiffs worked "insubstantial or insignificant period of time beyond the scheduled working hours . . . ." (*Id.*, at 22). Third, Defendants state that the statute of limitations defense applies to many of the opt-in plaintiffs' claims. (*Id.*, at 22-23). Finally, Defendants assert that some of the opt-in plaintiffs, such as Greg Zachary ("Zachary") were salaried exempt employees. (*Id.*, at 23).

Defendant will be allowed to raise these issues as defenses at trial. The Fifth Circuit has allowed the use of representative testimony in trials involving allegations of unpaid overtime. *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973). The Court does not find that Defendants' alleged defenses are so individualized that they cannot be addressed by representative testimony. See *Falcon*, 580 F. Supp. 2d at 540 (allowing Defendants to raise defenses through testimony and evidence at trial). Accordingly, the Court finds that Defendants will be allowed to raise its asserted defenses by examining representative plaintiffs and presenting its own evidence as trial.

### D.

The Court finds that fairness and procedural considerations weigh in favor of allowing this lawsuit to proceed collectively. Given the similarities of putative class members, it would not be in the interest of judicial economy to adjudicate the claims in individual trials. Additionally, decertifying

this class would be contrary to the purposes of the FLSA, as the FLSA is a remedial statute. *Falcon*, 580 F. Supp. 2d at 541 (citing *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993). "Although the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification." *Falcon*, 580 F. Supp. 2d at 541.

Accordingly, the Court **DENIES** Defendants' Motion to Decertify Collective Action and **ORDERS** that Wendy Garza be removed from the class. **(Instrument No. 162).**

## IV.

Defendants' Motion for Summary Judgment and Motion to Decertify Collective Action are **HEREBY DENIED. (Instrument Nos. 162, 163).** Plaintiff is **ORDERED** to remove Wendy Garza from the class.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 29ᵗʰ day of April, 2010, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

27